**MERRILL LYNCH, PIERCE, FENNER & SMITH, et al., Plaintiffs,**

v.

**Robert and Lois BARCHMAN, et al., Defendants.**

**No. 95 C 6466.**

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 28, 1996.

Peter A. Cantwell, Paul H. Scheuerlein and Peter E. Cooper of Cantwell & Cantwell, Chicago, for Plaintiff.

James E. Beckley and Leslie Gregory Bleifuss of James E. Beckley & Associates, Wheaton, for Defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, Senior District Judge.

Merrill Lynch, Pierce, Fenner & Smith ("Merrill Lynch"), Laurie Jones Canady ("Canady") and Stephen Lyders ("Lyders") have brought this action pursuant to Federal Arbitration Act ("Act") § 4, 9 U.S.C. § 4, to address several issues of claimed noncompliance with the arbitration agreement under which eight claimants[1] have brought a consolidated arbitration claim before the New York Stock Exchange ("NYSE").[2] For the reasons stated in this memorandum opinion and order, Respondents' motion adverted to in n. 3 is granted in part and denied in part.

### Factual Background[3]

Although this dispute has a long and contentious history, its plot and present cast of characters are reasonably spare. Canady is a former Merrill Lynch financial consultant who, during her tenure at the firm's Davenport, Iowa office, allegedly exploited her relationship with eight of her investor-clients (now Claimants) to enrich herself and Merrill Lynch. Lyders was Canady's supervisor at Merrill Lynch. Essentially Claimants assert that from January 1982 through March 1990 Canady built up her clients' trust and then railroaded them into the excessive use of margin purchases, switched in and out of various investments to run up broker's fees, made riskier investments than were suitable for Claimants' "conservative" investment needs, and generally put her own (and Merrill Lynch's) financial interests ahead of Claimants'.

At the outset of his or her relationship with Merrill Lynch, each Claimant signed a Cash Management Account agreement that included the following "Arbitration of Controversies" section (the "Arbitration Agreement"):

> Except to the extent that controversies involving claims arising under the Federal securities laws may be litigated, I agree that any controversy arising out of your business or this Agreement shall be submitted to arbitration conducted according to the rules and procedures of the New York Stock Exchange, Inc. ("NYSE") or of the National Association of Securities Dealers, Inc. ("NASD") as I may elect.

On March 6, 1992 Claimants invoked the Arbitration Agreement by filing a Claim in Arbitration with NYSE in which they proposed to act as representatives of a class of 600 investors that Canady had allegedly bilked. NYSE rejected the class action aspect of that claim. Then in October 1992 the nine original sets of Claimants filed the First Amended Claim in Arbitration ("First Amended Claim") at issue here, requesting that their individual claims be heard in a consolidated proceeding. Their First Amended Claim includes five counts: churning, common law fraud, breach of fiduciary duty, failure to supervise and lack of suitability.

Respondents did not immediately file an answer to either the original claim or the First Amended Claim. On both November 25, 1992 and December 15, 1992 Respondents' counsel wrote to NYSE's Senior Arbitration Counsel to protest Claimants' efforts to arbitrate their individual claims in one

---

1. Actually there are eight sets of claimants (some consist of a husband-wife couple). Initially one more husband-wife combination had joined with the others, but claimants' counsel have advised that they are no longer representing that couple.

2. To avoid any potential confusion created by referring to the parties here as "plaintiffs" and "defendants"—for plaintiffs in this federal suit are defendants in the arbitration action before the NYSE, and defendants here are plaintiffs in the NYSE arbitration—this opinion will refer to Merrill Lynch, Canady and Lyders collectively as "Respondents" and to defendants here collectively as "Claimants." Their respective exhibits will be designated "R. Ex. ——" and "C. Ex. ——."

Finally in definitional terms, any relevant NYSE Rule will simply be cited "Rule ——."

3. Even though Respondents' motion is labeled as one seeking "Entry of a Stay of Arbitration and Order Compelling Arbitration in Accord with Agreement To Arbitrate," effectively they are asking for summary judgment on the three issues that they now raise. That is, Respondents do not assert (at this time) that there are any genuine issues of material fact, but instead contend that they deserve a judgment as a matter of law. This Court will therefore credit Claimants' statement of the facts, together with reasonable inferences in their favor.

consolidated action (C. Ex. D). Nothing in the record indicates that NYSE responded to Respondents' protestations.

Apparently the parties negotiated throughout 1993. Still not having received an answer to the First Amended Claim, on April 22, 1994 Claimants filed suit in an Iowa state court to compel arbitration. One week later Respondents brought suit in a New York state court to enjoin certain parts of the arbitration. That New York action was dismissed on the ground that the court lacked personal jurisdiction over Claimants (C. Ex. F at 16). On August 31, 1994 the Iowa state court declined to exercise jurisdiction over the motion to compel (C. Ex. G at 3).

Finally an initial arbitration hearing was scheduled for December 1995. Before that hearing could take place Respondents filed this Complaint on November 7, 1995, asking this Court to:

1. hold that claims originating before October 1986 are not eligible for arbitration because Rule 603 imposes a six-year eligibility requirement, thus ordering the scope of the arbitration to be limited to that extent;

2. order Claimants to resubmit their consolidated claim as eight individual claims because the claims are inappropriate for consolidation under Rule 612(d); and

3. order Claimants to amend their claim to specify the relevant facts and remedies sought in compliance with Rule 612(a).

### *Underlying Legal Principles*

■ Before this opinion turns to the issues raised by Respondents, it is useful to discuss briefly the underlying legal principles involved. While some of the specifics raised here are new, the general lay of the land—

even though its directional arrows still need some reconciliation (see *PaineWebber Inc. v. Hofmann,* 984 F.2d 1372, 1381 (3d Cir. 1993)[4])—is well mapped out. On the one hand there is a strong federal policy favoring arbitration (*AT & T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986), quoting *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)):

An order to arbitrate ... should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage.

At the same time arbitration agreements are private contracts, so that courts should not force parties to arbitrate issues on which, or in a manner to which, they have not agreed (*id.* at 648). When those two concepts are placed side by side, the rule that emerges is that courts should allow arbitration to take its course, but only when the parties have agreed to do so in a written arbitration agreement.

■ Congress, via Act § 4, has given federal district courts the power to straddle those interrelated principles by enforcing the terms of written arbitration agreements.[5] But that role is limited by the federal policy favoring arbitration. Although courts do resolve the threshold questions of whether a valid arbitration agreement exists and whether the parties have agreed to arbitrate particular issues, both such resolutions being based on the terms of the written arbitration agreement (*Nielsen v. Piper, Jaffray & Hopwood, Inc.,* 66 F.3d 145, 148 (7th Cir.1995)), the seminal case of *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 557, 84 S.Ct. 909, 918, 11 L.Ed.2d 898 (1964)[6] makes it clear

---

**4.** Because many of the cases cited in this opinion have been brought by securities firms that are frequent litigants, this opinion will seek to avoid confusion in its repeat citations of such cases by using the defendants' rather than the plaintiffs' names for shorthand reference purposes.

**5.** To be precise, Act § 4 is not itself a jurisdiction-conferring provision—there must be an independent basis of federal jurisdiction before it

may be drawn upon (*Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 25 n. 32, 103 S.Ct. 927, 942 n. 32, 74 L.Ed.2d 765 (1983)).

**6.** It is inexplicable that *John Wiley* is cited only one time—and then in passing—in all of the materials tendered by the parties. Claimants' failure to mention the case until almost the end of their final submission is particularly perplex-

that *courts are not to reach out and micro-manage the procedural aspects of arbitration:*

Once it is determined ... that the parties are obligated to submit the subject matter of a dispute to arbitration, "procedural" questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator.[7]

As *Niro*, 827 F.2d at 176 later pointed out, *John Wiley* expressly rejected a classic substance-procedure dichotomy, instead making the arbitrability of the underlying subject matter a threshold question that, when answered in the affirmative, leaves all other issues (whether otherwise characterizable as substantive or procedural) for the arbitrators to decide:

This court and others have heeded *John Wiley* and are slow to enter the thicket of deciding whether, under a particular ... agreement reached by the private parties, an alleged violation of the agreement should be characterized as essentially "procedural" or "substantive." Federal courts face sufficiently daunting tasks trying to classify statutory requirements for purposes of the diversity jurisdiction. The prospect of conducting similar analyses of private ... agreements counsels caution. We agree, therefore, that once it is determined that the underlying dispute concerns a subject matter covered by arbitration provisions, the court's only role is to order arbitration. The arbitrator should determine the effect of any "procedural" shortcomings of either party.

Essentially *John Wiley* puts the district court in a role like that of a ticket-taker at an unreserved-seating entertainment event whose job is to check whether the parties have a valid ticket for the performance, but *who has no responsibility to decide for example where the parties should sit once inside, what time the show should begin and wheth-*er the guests' complaints about the quality of the show are valid.

■ With that framework in mind, it is time to turn to Respondents' claims. Though they make their specificity argument last, this opinion deals with that point first because it impacts on the six-year eligibility issue.

### Rule 612(a) and Specificity

Rule 612(a) provides (emphasis added):

The Claimant shall file with the Director of Arbitration an executed Submission Agreement, a Statement of Claim together with documents in support of the claim and the required deposit. Sufficient additional copies of the Submission Agreement and the Statement of Claim and supporting documents shall be provided to the Director of Arbitration for each party and each arbitrator. *The Statement of Claim shall specify the relevant facts and the remedies sought.* The Director of Arbitration shall endeavor to serve promptly by mail or otherwise on the Respondent(s) one (1) copy of the Submission Agreement and one (1) copy of the Statement of Claim.

Respondents contend that Claimants have not complied with that emphasized requirement. They urge that the First Amended Claim is a "cursory summary" that does not adequately "specify the relevant facts and the remedies sought." And they argue that this Court has the power to order compliance with Rule 612(a) because such compliance is a procedural prerequisite to arbitrating a claim.

Although that argument appears to pose an issue of first impression, *John Wiley* really points the way to its resolution. It should be recalled that it is the Arbitration Agreement that first defines the scope of arbitra-

---

ing, because *John Wiley* and its progeny in this Circuit (such as *Niro v. Fearn Int'l, Inc.*, 827 F.2d 173, 175–76 (7th Cir.1987) and *Chicago Typographical Union No. 16 v. Chicago Sun–Times, Inc.*, 860 F.2d 1420, 1424 (7th Cir.1988)) provide strong support for Claimants' positions on the consolidation and specificity issues.

7. [Footnote by this Court] *John Wiley* was decided in the context of Labor Management Relations Act § 301, 29 U.S.C. § 185, but its analysis is also applicable in the Act's setting (see, e.g., *DVC–JPW Investors v. Gershman*, 5 F.3d 1172, 1174 (8th Cir.1993); *Del E. Webb Constr. v. Richardson Hosp. Auth.*, 823 F.2d 145, 149 (5th Cir. 1987)).

bility (it speaks of "any controversy arising out of your [Merrill Lynch's] business or this [Cash Management Account] Agreement") and then refers to NYSE *only* for its "rules and procedures." That latter reference clearly calls into play the *John Wiley* proposition (376 U.S. at 557, 84 S.Ct. at 918) that once this Court determines the subject matter is arbitrable, " 'procedural' questions which grow out of the dispute and bear on its final disposition should be left to the arbitrator." Indeed, although they do not cite *John Wiley*, Respondents seem to recognize the need to avoid that concept by labeling Claimants' need to comply with Rule 612(a) as a prerequisite to bringing a claim, so that their asserted failure to comply with the Rule deprives the arbitrators of jurisdiction.

That argument simply won't work. While no cases cited by the litigants or located by this Court have dealt with the specific issue, cases that have applied *John Wiley* to reasonably comparable situations have rejected the type of analysis proffered by Respondents. For example, *Beer, etc., Drivers, et al., Local Union No. 744 v. Metropolitan Distribs., Inc.,* 763 F.2d 300, 303 (7th Cir. 1985) held that the arbitrators and not the court should decide whether a union's failure to follow the procedural prerequisites to arbitration outlined in a collective bargaining agreement (by setting out the timing requirements for the filing of grievances) should bar the arbitration. In fact, one underlying issue in *John Wiley* itself was whether the failure to comply with procedural prerequisites was a bar to arbitration. Virtually every case dealing with similar issues has decided that fulfillment of a procedural prerequisite is an issue for the arbitrator (e.g., *Beer, etc., Drivers,* 763 F.2d at 302 n. 2 (collecting cases); *Niro,* 827 F.2d at 176 (collecting cases)). Even if the specificity requirement of Rule 612(a) were to be read as a procedural prerequisite (something as to which this Court confesses some skepticism), it is plain that whether Claimants have complied with the rule and what effect any arguable noncompli-

ance on their part should have is a question for the arbitrators.[8]

Nor is Respondents' related policy argument persuasive. In that respect they contend that unless this Court orders Claimants to provide additional details in the First Amended Claim, the arbitrators will have insufficient information before them at the hearing because the NYSE Rules do not provide for extensive discovery. Quite apart from whether the NYSE arbitrators really are as helpless as Respondents make them out to be, that is just not this Court's problem. After all, the Arbitration Agreement that Claimants signed is obviously a form agreement put together by Respondents, and it expressly allows Claimants to use the NYSE Rules. It is hard to see why Respondents should now be heard to bemoan what they claim to perceive as inadequacies in the arbitration procedures that they themselves specified.

So much for what Respondents did argue. But to return to the point referred to in n. 8—a matter that this Court must resolve even though Respondents did not make it in that form—it is not enough that the general subject matter of the First Amended Claim falls squarely within the Arbitration Agreement because the parties there agreed to arbitrate "any controversy arising out of [Merrill Lynch's] business or this Agreement." It is also essential that Claimants provide enough detail to enable this Court to determine whether the asserted theories of recovery originated within the six-year eligibility period specified in Rule 603, which the law deems a threshold question for decision by this Court. Because that issue is a direct function of Rule 603's terms, this opinion will next examine Respondents' Rule 603 arguments, dealing with the related specificity questions as they come up.

### Rule 603 and the Six–Year Eligibility Requirement

■ Respondents ask to have all claims based on Claimants' purchase of invest-

---

**8.** There is of course one obvious exception: It is essential that the Statement of Claim required by Rule 612(a) contain enough specificity to permit

this Court to decide the question that *is* on its plate—the arbitrability of the claims themselves. More on this subject later.

ments [9] before October 1986 [10] barred from arbitration because Rule 603 states:

> No dispute, claim, or controversy shall be eligible for submission to arbitration under this Code where six (6) years have elapsed from the occurrence or event giving rise to the act or the dispute, claim or controversy. This section shall not extend applicable statutes of limitations, nor shall it apply to any case which is directed to arbitration by a court of competent jurisdiction.

Respondents cite three decisions from our Court of Appeals—*Smith Barney Inc. v. Schell*, 53 F.3d 807, 809 (7th Cir.1995), *Edward D. Jones & Co. v. Sorrells*, 957 F.2d 509, 512–14 (7th Cir.1992), and *PaineWebber Inc. v. Farnam*, 870 F.2d 1286, 1292 (7th Cir.1989)—for the proposition that Rule 603 is a threshold eligibility requirement to be decided by this Court.

Each of those cases did in fact rule that a party's compliance with a rule substantively equivalent to Rule 603 [11] is an eligibility requirement that must be met in order for a claim to be arbitrable. Less than a year ago *Schell* firmly reiterated the teaching of *Sorrells* and *Farnam* that in this Circuit "whether [Rule 603] bars a claim from submission to the arbitrators is for the court to decide" (53 F.3d at 809, citing *Sorrells*, 957 F.2d at 514 and adapted to this case). In terms of the *John Wiley* framework, Rule 603 is a component of the decision on what issues the parties have agreed to arbitrate—a question for the court and not the arbitrators. In so ruling, *Schell*, 53 F.3d at 809 specifically rejected an argument that *Sorrells* and *Far-*

*nam* should be overturned because the relevant rule (identical to Rule 603) is procedural in nature and therefore falls on the "arbitrator side" of the line drawn by *John Wiley*.

Astonishingly, Claimants' first line of attack is to urge *this Court* either to disregard or to overturn *Schell, Sorrells*, and *Farnam*. Claimants attempt to call to their aid the history of the NYSE Rules and the holdings of four other Courts of Appeals that the six-year eligibility requirement poses an issue to be decided by the arbitrators. But that effort violates a principle that is axiomatic even for first-year law students: Given the place that every District Court occupies in the hierarchy of the federal judiciary, it is duty-bound to apply the law as set forth by the Court of Appeals in which the District Court sits. Of course this Court cannot revisit an issue that has expressly been decided not once but *three times* by our Court of Appeals. Claimants' first argument is rejected summarily.

Claimants' second line of argument holds more potential. Pointing out that any universal definition of the "occurrence or event" that triggers the start of the six-year eligibility period is an open question (see *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Lauer*, 49 F.3d 323, 325 n. 6 (7th Cir.1995)), they ask this Court to read that concept broadly so as to include all of Respondents' allegedly improper actions (even those occurring before March 6, 1986)—at least so long as Claimants' investments were part of a continuing wrong that extended into the six-year period. At the other extreme, Respon-

9. Here and elsewhere this opinion speaks of investments in terms of their *purchase* by Canady on Claimants' behalf. Of course where a claim such as breach of fiduciary duty or churning is involved, the relevant "occurrence or event" could instead be the *sale* of an investment, and what is said throughout this opinion should be read more broadly to encompass such claims as well.

10. That date is obviously derived from Rule 603's six-year provision and the fact that the First Amended Claim was filed on some date—and neither party has provided a specific one—in October 1992. But although neither side has spoken on the subject, it would seem that the determinative commencement date should rather be March 6, 1992, the date on which Claimants

filed their original claim. To be sure, NYSE rejected the class aspect of that first claim, but the original claim (C. Ex. A) involved the same parties and the same counts. Unless Respondents can explain why the original claim should not be treated as the "submission to arbitration" referred to in Rule 603 (quoted next in the text), this Court will treat March 6, 1986 (six years before March 6, 1992) as the watershed date in deciding timeliness. This opinion is written on that assumption.

11. All three cases actually dealt with Section 15 of the arbitration rules of the National Association of Securities Dealers, Inc. ("NASD"), a provision that is identical to Rule 603 in all relevant respects.

dents urge that the "occurrence or event" that starts the six-year eligibility clock ticking is always the date on which an investment was made. On that view, all claims based on pre-March 6, 1986 investments are stale and should not be arbitrated.

Because of our Court of Appeals' 1995 non-holding in *Lauer*, Respondents are wrong in their position that the case law dictates that the purchase date *always* marks the relevant "occurrence or event." On that score Respondents—and even some of this Court's colleagues—have overstated the law.[12] Theories of recovery are not "one size fits all." This Court must rather look at each theory of recovery and determine what "occurrence or event" gives rise to the claimed wrong. *Hofmann*, 984 F.2d at 1383 (some citations omitted, and adapted to this case) nicely summarizes the district court's task in undertaking the "occurrence or event" inquiry:[13]

[T]he court will have to determine what was the relevant occurrence or event and when it occurred. In resolving that issue, the court must again take care "not to rule on the potential merits of the underlying claims," as [Claimants are] entitled to have even frivolous claims ruled on by arbitrators. *AT & T Technologies*, 475 U.S. at 649–50 [106 S.Ct. at 1418–19]. Even if the court believes that one or more of [the] claims are meritless, it still has an independent obligation to identify the relevant occurrence or event that would give rise to such a claim if it were cognizable. If the occurrence or event giving rise to that claim is within the six year period established under [Rule 603], then the court must refer the claim to arbitration.

## Lack of Suitability and Breach of Fiduciary Duty

■ Claimants' lack of suitability and breach of fiduciary duty claims are susceptible to a single analysis, because even though each of them asserts a different theory of liability both are based on the same events: individual investments. That is certainly true of the lack of suitability theory, for there the ultimate question for the arbitrators will be whether or not each investment was suitable (according to the investor's stated needs) on the date it was made. It is equally true of Claimants' breach of fiduciary duty theory, as to which the First Amended Claim asserts:

57. Claimants opened non-discretionary accounts with Respondent MERRILL LYNCH. Nevertheless, Respondent Laurie Jones CANADY, acting in her capacity as a MERRILL LYNCH employee and agent, exercised discretion over the accounts by purchasing stocks and mutual funds without the knowledge, approval or authorization of Claimants.

58. The continuing exercise of discretion over Claimants' accounts created a fiduciary duty to Claimants in MERRILL LYNCH, LYDERS, and CANADY.

59. Respondents breached their fiduciary duty to Claimants by:

(a) failing to render the required standard of care in handling Claimants' accounts;

(b) failing to consult Claimants prior to the entry of orders;

(c) failing to disclose the risks and economic disadvantages to Claimants of

---

**12.** For example, *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Jana*, 835 F.Supp. 406 (N.D.Ill. 1993) held that *Sorrells* dictated that the "occurrence or event" was necessarily the date of investment; and see also *Mutual Service Corp. v. Spaulding*, 871 F.Supp. 324, 328–29 (N.D.Ill. 1994); *Smith Barney, Harris Upham & Co. v. St. Pierre*, No. 92 C 5735, 1994 WL 11600, at *4 (N.D.Ill. Jan. 4). Each of those cases dealt with claims based on lack of suitability, fraud or breach of fiduciary duty—claims that are properly anchored in the date that an investment was made. But it is one thing to say that the occurrence or event that gives rise to such claims is the purchase of the security involved, and quite

another to make the more sweeping assertion that *all* claims are necessarily born on the purchase date (see *Pacific Brokerage Serv., Inc. v. National Fin. Serv. Corp.*, 864 F.Supp. 61, 62–63 (N.D.Ill.1994)).

**13.** *Hofmann, id.* at 1382–83 also instructs that the District Court must initially determine "whether the parties intended to submit disputes over the operative occurrence or event, and/or when it occurred, to arbitration." That step is unnecessary here, because neither side has argued that the Arbitration Agreement makes either of those questions an issue for the arbitrators.

margin trading of CIT's, MIT's, and mutual funds.

(e) [sic] trading the Claimants' accounts in complete disregard of their age, education, investment experience, investment objectives, and financial resources.

As claimants would thus have it, the purchases made by Canady breached a fiduciary duty that she owed to each Claimant. Again the key occurrence is always the purchase or sale of each investment—if the arbitrators do find that Canady owed the Claimants a fiduciary duty, they must decide on a purchase-by-purchase basis whether Canady breached that duty.

In its present generalized form, the First Amended Claim does not provide the details needed for this Court to rule which claims are and which are not eligible for arbitration under Rule 603. Although it is this Court's function to determine whether Claimants have complied with the six-year eligibility requirement of that Rule, only a slavish fidelity to form would require this Court to order Claimants to amend their First Amended Claim so that this Court could make that determination. After all, no more is involved in that process than identifying the date of each transaction involved. Accordingly, on or before March 21, 1996 Claimants are ordered to file a Second Amended Claim that lists the purchase date of every investment that was allegedly unsuitable or the date of every transaction that was allegedly a breach of fiduciary duty. Once that has been done, the arbitrators can proceed with the lack of suitability and breach of fiduciary duty claims that are based on March 6, 1986 or later transactions. This Court holds that transactions antedating March 6, 1986 are stale under Rule 603 and orders them barred from arbitration.

*Churning*

■ Claimants' churning theory calls for a different approach. Unlike lack of suitability and breach of fiduciary duty, churning is by definition a cumulative wrong—as *Costello v. Oppenheimer & Co.,* 711 F.2d 1361, 1367 (7th Cir.1983) (emphasis added) explains:

> The term "churning," in the context of securities regulation, denotes *a course of excessive trading* through which a broker advances his own interests (e.g. commissions based on volume) over those of his customer.

Thus the purchase or sale of any one investment would not of itself trigger the six-year eligibility period on the churning count. Instead the six-year clock began to tick as to each Claimant at the point that the trading activity in his or her account became excessive.[14] Although Claimants contend that excessive trading continued well after March 6, 1986, so as to bring the churning count safely within the six-year eligibility period, even brief analysis exposes the overly simplistic nature of that argument.

■ To begin with, it is plain that at least one key "occurrence or event" for purposes of the six-year eligibility (but not necessarily the only relevant "occurrence or event") is the first transaction that rendered the overall trading activity in a Claimant's account excessive. If that event did not occur as to a particular Claimant until March 6, 1986 or later, the Claimant's claim based on that and all later assertedly excessive trades are unquestionably rendered arbitrable. But suppose that the churning claim initially ripened *before* the March 1986 watershed date. Neither side has thought to address the question whether in that situation the six-year eligibility rule would not only bar all claims based on trades that preceded the critical date, but

14. This is an area of law in which the discovery rule that often tempers a statute of limitations (in this instance, the rule would have deferred the commencement of the statutory period until a Claimant actually *knew* that the trading activity in his or her account was excessive) does not apply. *Sorrells,* 957 F.2d at 512–13 and *Farnam,* 870 F.2d at 1292 make clear that Rule 603 "is an eligibility requirement and not a statute of limitations and thus cannot be tolled." It is thus irrelevant when any Claimant first learned that excessive trading was taking place. Just as the six-year clock began to run as soon as an investment was made, even if the investment was fraudulently concealed from the investor (see *Sorrells,* 957 F.2d at 512–13), so too did the clock commence at the time that trading activity became excessive even if the Claimant was then unaware of that excessiveness.

854

whether it might also operate to bar the churning claim altogether.[15]

This Court is of course mindful that its normally prescribed role is not to resolve the merits of any of the claims—that is for the arbitrators to do. But our Court of Appeals has earlier this month reconfirmed that the just-stated principle must recede somewhat in the present context—*Local 744, Int'l Bhd. of Teamsters v. Hinckley & Schmitt, Inc.*, No. 95–2371, 1996 WL 55608, at *3 (7th Cir. Feb. 12) quotes *Independent Lift Truck Builders Union v. Hyster Co.*, 2 F.3d 233, 236 (7th Cir.1993):

> It appears that the rule that courts must decide arbitrators' jurisdiction takes precedence over the rule that courts are not to decide the merits of the underlying dispute. If the courts must, to decide the arbitrability issue, rule on the merits, so be it.

And this Court cannot discharge its own duty to decide which claims do and which do not come within the scope of the litigants' agreement to arbitrate—the decision as to which claims are and which are not stale under Rule 603 and hence are either eligible or ineligible for arbitration—without obtaining more grist for its decisional mill.

Hence the already-ordered Second Amended Claim must also flesh out the facts (the "occurrences" or "events") on which each Claimant grounds his, her or their churning claim. Within the same time frame (on or before March 21) both sides are ordered to file memoranda addressing the legal question as to excessive trading identified in the preceding paragraphs and n. 15. At that point this Court will be better able to see what if any further input is needed so that the open question can be resolved.

*Common Law Fraud*

■ While the three claims already discussed are understandable despite their lack of some details as to dates, Claimants' common law fraud claim is so devoid of information that it is impossible to discern the precise gravamen of what Claimants are asserting. Here is the First Amended Claim's fraud count in its entirety:

> 54. Claimants reaffirm and reallege Paragraphs 1 through 55 as their Paragraph 56 [sic].[16]
>
> 55. Respondents actions as alleged above constitute common law fraud.
>
> WHEREFORE, Claimants request that this Claim be heard as a consolidated proceeding in Davenport, Iowa, and further request such awards as would compensate them for their losses, including commissions, or, in the alternative, such sums as they would have earned had their accounts been prudently managed and invested in conservative MERRILL LYNCH mutual funds. In addition, Claimants seek punitive damages in the sum of $10,000,000.00.

New York law[17] conforms to that of most jurisdictions in defining the elements of common law fraud as (1) a material false representation, (2) an intent to defraud, (3) reasonable reliance on the representation (4) and damage caused to plaintiff (*Katara v. D.E. Jones Commodities, Inc.*, 835 F.2d 966, 970–71 (2d Cir.1987)). It is impossible to discern from Claimants' conclusory First Amended Claim just what specific representations they say were fraudulent, and consequently just what "occurrence or event" started the six-year eligibility clock as to each Claimant.

Because this Court must decide that question, it orders each Claimant to include in the

15. That question would appear at first blush to relate closely to the issues of damages and limitations in churning cases generally. In areas such as the antitrust laws and RICO, the familiar approach is to treat each successive act in violation of the statute as carrying its own limitation period—but analogies in the law tend to be treacherous, and the litigants here should do their homework and present this Court with the results of that research.

16. [Footnote by this Court] Claimants' counsel have employed obviously incorrect (and hence

confusing) numbering throughout the First Amended Claim—indeed, the pleading entirely omits any Counts IV and VI, so that the five counts end with Count VII. In this instance the common law fraud claim (Count II) incorporates by reference the allegations that are common to all five theories of recovery plus three substantive paragraphs from the Count I churning claim.

17. In the customer agreements entered into by most if not all the Claimants, there is a choice of law provision that looks to New York substantive law.

already-ordered Second Amended Claim the particulars as to the representations that were allegedly fraudulent, the date on which each such misrepresentation was .allegedly made and the other chapter-and-verse information that would be required if that pleading were a federal court complaint sounding in fraud that had to conform to Fed.R.Civ.P. ("Civil Rule") 9(b)—see, e.g., *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 923 (7th Cir.1992) ("In other words, the plaintiff must plead the 'who, what, when, and where' of the alleged fraud"). Once that information has been provided, only representations made after March 6, 1986 will be allowed to proceed to arbitration. Or if no such amendment to the fraud claim is tendered, this Court will proceed on the premise (surely a reasonable one, given the present fraud claim's mere incorporation of the other claims by reference) that no other "occurrence or event" is at issue on the fraud theory.

*Failure To Supervise*

 Finally, Claimants' failure-to-supervise claim is an attempt to impose liability on Merrill Lynch and on Canady's supervisor Lyders because they did not prevent Canady from bilking Claimants in the ways already discussed. Here are the failure-to-supervise allegations set out in the First Amended Claim:

63. Respondent MERRILL LYNCH had actual knowledge of the unsuitability of Claimants for the investments purchased for Claimants' accounts, as well as the churning of Claimants' accounts. In particular, MERRILL LYNCH was aware that purchase of mutual funds, CIT's and MIT's on margin virtually guaranteed that the Claimants could not achieve their investment objectives.

64. MERRILL LYNCH regional compliance never took any action to terminate any of the activities of Respondents CANADY and Lyders during CANADY' [sic] tenure at MERRILL LYNCH. The effect of this failure was the enrichment of MERRILL LYNCH.

\* \* \* \* \* \*

67. MERRILL LYNCH's and LYDER's [sic] failure to supervise the activities of CANADY violates Rule 405(2) of the New York Stock Exchange and Article III, Section 27 of the Rules of Fair Practice of the National Association of Securities Dealers.

That last theory is derivative of the other four theories, so that any recovery on failure-to-supervise grounds is contingent upon recovery under some or all of the other theories. That is, for Merrill Lynch or Lyders or both to be liable for failing to supervise Canady's recommendation of unsuitable investments or her breach of fiduciary duty, fraud or churning, Claimants must first show that Canady actually did those things. Thus the eligibility of this final claim depends on the eligibility of one or more of the other claims as outlined above. This Court therefore holds that Claimants' failure-to-supervise theory is eligible for arbitration only insofar as the underlying lack of suitability, breach of fiduciary duty, churning and common law fraud theories are within the six-year eligibility period.

*Rule 612(d) and Consolidation*

 Respondents also contend that Claimants should be forced to resubmit their consolidated claim as eight individual claims. Respondents anchor that contention to Rule 612(d):

(1) Permissive Joinder. All persons may join in one action as claimants if they assert any right to relief jointly, severally, or arising out of the same transaction, occurrence or series of transactions or occurrences and if any questions of law or fact common to all these claimants will arise in the action.... A claimant or respondent need not assert rights to or defend against all the relief demanded. Judgment may be given for one or more of the claimants according to their respective rights to relief, and against one or more respondents according to their respective liabilities.

In Respondents' view the eight Claimants do not have claims arising out of "the same transaction, occurrence or series of transactions or occurrences," so that Rule 612(d) does not permit consolidation. And Respondents argue that this Court should rule on

the consolidation issue because Claimants' failure to comply with Rule 612(d) is a failure to abide by the terms of the Arbitration Agreement. On Claimants' part, the only basis on which they say that their claims should be consolidated is this (First Amended Claim ¶ 29):

> Claimants are individuals who have held accounts with Respondent MERRILL LYNCH's Davenport Office from 1982 to 1990. Their account executive was Laurie Jones CANADY. They all reposed trust and confidence in her. Each of their accounts was churned by CANADY.

Once again *John Wiley* provides the light that illuminates the analytical path: If the subject matter of the claim is arbitrable, then all underlying procedural problems are for the arbitrators to decide. And as discussed in the previous sections, there is no question that the claims here fall within the broad range of the Arbitration Agreement. Hence once the already-outlined determinations have been made, *John Wiley* makes consolidation a textbook procedural issue to be dealt with by the arbitrators.[18]

That is especially true here, where the parties have explicitly conferred upon the arbitrators the power to decide the consolidation issue. While Respondents have quoted only Rule 612(d)(1), the rest of Section 612(d) is directly relevant to the instant question:

> (2) In arbitrations where there are multiple Claimants, Respondents and/or Third Party Respondents, the Director of Arbitration shall be authorized to determine preliminarily whether such parties should proceed in the same or separate arbitrations. Such determinations will be considered subsequent to the filing of all responsive pleadings.

> (3) The Director of Arbitration shall be authorized to determine preliminarily whether claims filed separately are related and shall be authorized to consolidate such claims for hearing and award purposes.

> (4) Further determinations with respect to joining, consolidation and multiple parties under this subsection may be made by the arbitration panel and shall be deemed final.

There could scarcely be a clearer statement of an intention to have the consolidation issue decided by the arbitrators. It has recently been confirmed that parties may validly contract to give arbitrators, rather than the court, the jurisdiction to decide over just what issues the arbitrators have jurisdiction (*First Options of Chicago, Inc. v. Kaplan,* —— U.S. ——, ——–——, 115 S.Ct. 1920, 1923–24, 131 L.Ed.2d 985 (1995)). A fortiori, then, parties can by agreement give arbitrators the power to decide what claims should be consolidated. And that is the fairest reading of Rule 612(d) in its totality.

Respondents urge however that Rule 612(d) does not give the arbitrators the power to deconsolidate actions that are filed as consolidated claims, so that this Court must do so. They point out that Rule 612(d)(2) uses the plural "arbitrations," thus speaking only to situations in which NYSE's Director of Arbitration might want to bring previously separate claims together into one action. From that springboard they leap to the conclusion that the Director of Arbitration has no power to deconsolidate claims filed in a single action under Rule 612(d)(1). In consequence, they say, only this Court can provide the relief that they seek: deconsolidation of claims improperly combined by the claimants.

---

18. Respondents cite several cases for the proposition that this Court has jurisdiction to deconsolidate the claims when consolidation (or class treatment) is not in accordance with the arbitration agreement (e.g., *Champ v. Siegel Trading Co.,* 55 F.3d 269, 274–77 (7th Cir.1995); *Government of United Kingdom v. Boeing Co.,* 998 F.2d 68, 71–74 (2d Cir.1993)). But they have overstated the holdings in these cases, and in doing so have missed the point of the *John Wiley* analysis. Both *Champ* and *Boeing* involved scenarios in which there was no consolidation clause or provision for class treatment in the arbitration agreement. Each case rejected the notion that class treatment under Civil Rule 23 or consolidation under Civil Rule 42 could be foisted on the parties via Civil Rule 81(a)(3). Both cases are inapposite here, where as next discussed in the text (1) the NYSE "rules and procedures" invoked by the Arbitration Agreement explicitly provide for consolidation of related claims and (2) those "rules and procedures" expressly vest the decisional power in the arbitrators.

Respondents' crabbed exegesis defies both the language of Rule 612(d) and common sense. While Respondents would have this Court stop reading Rule 612(d)(2) after its second word "arbitrations," such a limited reading glosses over the references in the rest of that paragraph to arbitrations where there are multiple parties on one or both sides.[19] Rule 612(d)(2) clearly focuses on situations where there are multiple parties on one or both sides of an arbitration action, and it authorizes the Director of Arbitration to make a preliminary determination of whether the action should proceed as a consolidated action or should be deconsolidated. That is precisely the case here.

And as already stated, the same reading of Rule 612(d)(2) is compelled by common sense as well. Respondents do not dispute that Rule 612(d)(1) allows parties to file consolidated claims in the first instance, nor do they dispute the plain authorization under Rule 612(d)(3) for the Director of Arbitration to consolidate claims that have been filed separately. Even apart from the fact that Respondents' version of Rule 612(d)(2) would render it merely redundant of Rule 612(d)(3) (albeit somewhat more wordy), would it really make sense to give parties the ability to file consolidated claims and not give the arbitrators the power to deconsolidate claims?

But the final nail in Respondents' analytical coffin is driven by Rule 612(d)(4). Both Rule 612(d)(2) and Rule 612(d)(3) repose only the power to make *preliminary* determinations in the Director of Arbitration. By contrast, the *final* power to make any decisions as to joinder, consolidation and multiple parties is vested by Rule 612(d)(4) in the arbitration panel that is actually assigned to decide the parties' disputes. No matter how the first three paragraphs of Rule 612(d) are read, the all-inclusive provision of Rule 612(d)(4) squarely confers on the arbitrators the jurisdiction to decide the consolidation issue.[20]

Finally, no credence can be given to Respondents' added argument that the application of Rule 612(d) would somehow be unfair to them. They contend that because Rule 612(d)(2) does not allow for the consolidation decision to be made until after responsive pleadings are filed, it is unlikely that fully-answered claims would be severed, and even if they are it would be a "complex and inefficient process." But so what? Claimants signed Arbitration Agreements to which Respondents not only agreed but that had been drafted by Merrill Lynch itself. It is unnecessary to speculate about contracts of adhesion vel non to reject Respondents' cries of "unfair" about an Arbitration Agreement that they not only freely entered into but that had come from Merrill Lynch's pen (or computer).

In sum, this Court holds that both *John Wiley* and Rule 612(d) make consolidation an issue for the arbitrators to decide. Respondents' request that this Court enter that arena by ordering deconsolidation is therefore denied.

## Conclusion [21]

Respondents' request that this Court order Claimants to make their claim more specific

---

**19.** Taken in context, the use of "arbitrations" is really nothing more than a grammatical choice. Rule 612(d) would have exactly the same meaning if it began, "In *an arbitration* where there are multiple Claimants, Respondents and/or Third Party Respondents ..." (emphasis added only to highlight the contrast).

**20.** This discussion cannot be completed without observing that Respondents' own conduct should have instilled some diffidence on their part (although it obviously did not) in arguing a lack of power over the consolidation question even on the part of the Director of Arbitration. On two occasions—November 25, 1992 and December 15, 1992—Respondents' counsel wrote to NYSE's Senior Arbitration Counsel protesting that the claims should not go forward as a consolidated action (C. Ex. D). Unless Respondents are willing to concede that those letters were requests to exercise jurisdiction in the absence of jurisdiction, such attempts to seek relief from the Director of Arbitration really give the lie to their argument that the Director of Arbitration lacked the power to grant such relief.

**21.** This opinion cannot close without returning to the point (see n. 6) that neither side's briefing had really recognized the pivotal importance of *John Wiley* in answering the core question in this action: the relative roles of courts and arbitrators in resolving the issues in dispute between the parties. Despite each side's tendering of two memoranda (*simultaneous cross-filings, followed*

is granted only to the extent that, as discussed in this opinion, such specificity is necessary to make the eligibility determinations under Rule 603. Once Respondents have submitted a Second Amended Claim on or before March 21, 1991 that includes the information specified in this opinion, this Court will order the arbitrators to proceed (in accordance with this opinion) with the arbitration of claims that arose on or after March 6, 1986.[22] Respondents' request that this Court order Claimants to resubmit their claims as eight individual claims is denied.

Finally, because it appears likely that the Second Amended Claim will not alone resolve the open issues that have been discussed here, a status hearing should be held shortly after it is filed. Accordingly such a status hearing is set to be held at 9 a.m. March 28, 1996.

---

by the simultaneous cross-filing of responses) that were chock-full of case citations, quotations and analyses, it was not until nearly the end of Claimants' final submission that a citation to and a brief quotation from *John Wiley* was brought forward. This is said not so much as a criticism of counsel's efforts, but rather in recognition of the percipience of this Court's first-rate law clerk Scott Schutte, Esq. in having spotted the key significance of *John Wiley* and its progeny to the questions that are posed by this litigation and accordingly in having shaped a proposed draft opinion in those terms, rather than as the parties

had framed matters. One final word: This brief tribute should in no event backfire if a different view of the controversy were ultimately to prevail—this Court's invariable word-by-word editing and revision of its clerks' draft opinions assure that if any errors exist, they are always this Court's sole responsibility and not that of its able clerks.

22. As stated earlier, that kickoff date is subject to modification only if Respondents tender a persuasive showing that an October 1986 date should apply instead.